UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
_____

MICHAEL KIENITZ,

                Plaintiff,                      OPINION AND ORDER

    v.

                                                  12-cv-464-slc

SCONNIE NATION LLC, and
UNDERGROUND PRINTING-WISCONSIN, L.L.C.,

                Defendants.
_____

        In this civil action for copyright infringement, plaintiff Michael Kienitz alleges that defendants Sconnie Nation LLC and Underground Printing-Wisconsin, LLC infringed his copyright in the Official Portrait of Mayor Paul Soglin by using the photograph on t-shirts and tank tops manufactured, promoted and sold in connection with the 2012 Mifflin Street Block Party in Madison, Wisconsin. Before the court are the parties' cross motions for summary judgment on the issue of whether defendants' use of the photograph was a fair use permitted by the Copyright Act. Dkts. 13 and 16.[1] Because the parties agree on the material facts, they ask the court to decide their dispute as a matter of law. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985) (where material facts not in dispute, fair use appropriately decided on summary judgment). After balancing the relevant factors, I conclude that defendants have met their burden with respect to the affirmative defense of fair use and are entitled to summary judgment on Kienitz's copyright infringement claim.

        Pursuant to the parties' stipulation (dkt. 10), the following material facts are undisputed:

---

[1] Although Kienitz styles his submission as a brief in opposition to defendants' motion for summary judgment, he asks the court to consider it his cross motion for summary judgment, which I will do.

FACTS

**I. The Parties**

Plaintiff Michael Kienitz is a journalist and photographer who resides in Madison, Wisconsin. Since the 1980s, Kienitz has covered violent conflict around the world, and his photographs have been published in *Life*, *Time*, *Newsweek*, and other major publications worldwide. A collection of his war photography was published in a 2007 book titled *Small Arms: Children of Conflict*. Kienitz's photographs include one of "Lady Liberty" on frozen Lake Mendota and another of 2,000 plastic flamingos on Bascom Hill at the University of Wisconsin-Madison. These two photographs have been published, under license from Kienitz, in numerous magazines and newspapers.

Defendant Sconnie Nation LLC (Sconnie) is a Wisconsin limited liability company in the business of developing retail apparel products, including novelty t-shirts, and managing the "Sconnie" brand via various licensing arrangements.

Defendant Underground Printing-Wisconsin, LLC (Underground) is a Wisconsin limited liability company that is in the business of apparel retail, custom screen printing, and promotional products. Underground operates a retail store at 521 State Street in Madison, Wisconsin, at which it sells novelty t-shirts and apparel. Underground also sells products through websites, such as www.sconnie.com and www.wiscrelic.com. Underground has a licensing agreement with Sconnie, which consults with Underground regarding the development of t-shirts and other products. Underground supervises the actual production and sale of the t-shirts and products.

## II. Kienitz's Licensing Practices

For more than 40 years, Kienitz has earned a living gathering and producing original journalism and photographs. Part of his income is derived from licensing his photographs, which sometimes produce licensing income long after their creation and first publication. The Lady Liberty and flamingo photographs were licensed many times, and a 1975 portrait of Paul Soglin was licensed for the 1999 book, *Frank Lloyd Wright's Monona Terrace: The Enduring Power of Civic Vision*, by David V. Mollenhoff.

When licensing his photos, Kienitz generally knows the details of how the photos will be used. The price that he charges for a license is contingent on the use of the photographing because he wants control over the way his photos are used. Kienitz has denied requests for licenses to his photos when he did not approve of the intended use of the photo. For example, Kienitz denied a request from a sandwich shop to use his "Lady Liberty" photograph in advertising because the sandwich shop wanted to use a version of the photograph featuring a sandwich in place of Lady Liberty's torch.

In the past, Kienitz has licensed photos through stock photo agencies.[2] Therefore, he would not have known all the expressive purposes for which a particular photograph could have been or was used when licensed through a photo agency. To his knowledge, Kienitz has never licensed one of his photos for the purpose of criticizing, mocking, parodying, or satirizing the subject of the photo. Kienitz is aware of one instance in which a licensee used a photograph in a manner that was derogatory to or critical of the subject of the photo. Had Kienitz known his

---

[2] Kienitz has not licensed through photo agencies for many years.

3

licensee intended to use his photograph for that derogatory or critical purpose, however, he would not have licensed the photograph to that licensee.

### III. Kienitz's Photograph of Soglin

Kienitz photographed Mayor Soglin, his family, and his staff on April 19, 2011 at the mayoral inauguration ceremony. These photographs were the culmination of Kienitz's documentation of the 2011 Soglin campaign, which began the day Soglin announced that he was going to run for mayor.

After the April 2011 inauguration ceremony, Mayor Soglin's office contacted Kienitz to obtain and use a photograph of Mayor Soglin. Kienitz sent Mayor Soglin's office a group of photographs that he took during the 2011 campaign. The mayor's office chose a photograph that Kienitz had taken at the April 19, 2011 inauguration ceremony. *See* Soglin photo, dkt. 10, Exh. A, shown here:



4

Kienitz verbally gave permission for Mayor Soglin to use the photograph for any noncommercial purposes he desired, and for his staff to use the photograph in connection with Mayor Soglin's political activities and for noncommercial uses by news organizations. Kienitz did not place any other restrictions on their use of the photograph or charge Mayor Soglin or his staff a fee for using it. The Soglin photograph was displayed on the City of Madison's official website beginning on April 26, 2011. Effective May 1, 2012, Kienitz registered the photo, which he has titled the "Official Portrait of Mayor Paul Soglin," with the U.S. Copyright Office, Registration No. VA 1-812-155.

At all times relevant to this dispute, the City of Madison website included the visible notation "photo credit" in the lower right corner of the photograph. If an internet user hovers his or her mouse over the photograph on the website, a full photo credit pops up stating: "Photo Credit: Michael Kienitz." The City of Madison website has never included a statutory copyright notice for the photo.

### IV.  The Mifflin Street Block Party

The Mifflin Street Block Party is an annual event that began in May 1969 as part of the student protest movement on the UW-Madison campus. At that time, Paul Soglin was a student protest leader at UW-Madison and a Madison alder. Soglin attended the first Mifflin Street Block Party and was arrested at the event. In 1972, Soglin was elected mayor of Madison and over the course of the next 40 years, he has served as mayor for more than 15 years during three separate periods.

In a September 10, 2011 interview with *The New York Times*, Soglin said of his participation in and arrest at that first Block Party: "There was an underlying theme of taking a sharp stick . . . and poking it in the eye of authority." The article stated: "Mr. Soglin acknowledges that he has grown to favor 'a sense of order.' That was not exactly a central theme during his protest days, and it causes some amusement among plenty of free-spirited young people." The New York Times article quoted Madison Common Council member Mike Verveer as saying, "It's a little ironic, since it was the student vote that originally got Paul elected."

Soglin was Madison's mayor at the time of the 2012 Mifflin Street Block Party, which had become a controversial event subject to significant political debate in Madison. Following the block party in 2011, the Wisconsin State Journal quoted Mayor Soglin when asked about the future of the event, as declaring, "All I'm interested in is ending this thing." Shortly after the 2011 party, an Underground employee suggested that Sconnie and Underground should sell a shirt in 2012, criticizing in a humorous manner Mayor Soglin's opposition to the block party.

## V. The "Sorry For Partying" Shirt

In March 2012, with controversy beginning to percolate over the upcoming May 5, 2012 block party, Sconnie and Underground decided to create and sell t-shirts and tank tops with the phrase "Sorry For Partying." In order to make the target of their commentary clear, Sconnie and Underground sought a recognizable image of Mayor Soglin to reproduce on the shirt. After a quick internet search, they found the Soglin portrait on the City of Madison's official internet website, [www.cityofmadison.com.](www.cityofmadison.com.)

A small version of this photograph appears on the homepage, and a larger version is prominently displayed on the "Mayor" page. The photograph also was displayed, and continues to be displayed, on the home page for Mayor Soglin's internet blog, www.waxingamerica.com. The blog website is operated by Mayor Soglin's campaign committee. Sconnie and Underground discovered that the photograph also was displayed, and continues to be displayed, on Mayor Soglin's Facebook profile.

Underground, in consultation with Sconnie, downloaded a digital copy of Kienitz's Soglin photograph from the City of Madison website. Underground altered the photograph so that Mayor Soglin's face is lime green against black, outlined in bright blue and wreathed on three sides with the phrase "Sorry For Partying," in alternating blue, green and pink spike-fonted lettering. Here's an example:



7

Underground screen-printed 65 tank tops and 96 t-shirts (hereafter referred to as the "SFP shirts" or "the shirts").[3]

In consultation with Sconnie, Underground sold the SFP shirts between April 2 and May 6, 2012, stopping the day after the 2012 block party. The shirts were sold at Underground's retail store and online at www.sconnie.com and www.wiscrelic.com. Underground sold 54 shirts for $24.99 each and received $1,349.46 in gross revenue. Underground's cost per shirt was $8.13, allowing Sconnie and Underground to earn a gross profit of $910.44.[4]

On about April 24, 2012, Kienitz received a communication from Mayor Soglin via Facebook, stating that someone had created a shirt featuring Kienitz's photo. On May 1, 2012, a week after hearing from the Mayor, Kienitz filed an application for federal registration of his copyright in the Soglin photograph. Kienitz has not identified any lost sales or licensing revenue that he has suffered as a result of defendants' use of the Soglin photograph on the SFP shirts.

Kienitz would never license the Soglin photograph for purposes of criticizing, mocking, parodying, or satirizing Mayor Soglin. Kienitz is a current and long-time political supporter of Paul Soglin. Kienitz has chronicled Mayor Paul Soglin's political career in the City of Madison since the mid-1970s, including Mayor Soglin's political campaign in 2011.

---

[3] Kienitz believes that it was easier and cheaper to screen print a high-contrast, monochrome version of the Soglin photograph than the half-tone version of the photograph displayed on the City of Madison website. Sconnie and Underground dispute this, contending instead that they created and used the high-contrast, monochrome version because it reflected a neon- colored "party" aesthetic that they thought would be appealing to students attending the block party.

[4] The parties do not report who absorbed the cost of the 107 printed-but-unsold t-shirts and tank tops, which presumably cost someone a total of $861.91 to print.

OPINION

The sole issue before the court on summary judgment is whether defendants' use of the Soglin photograph was a fair use and, therefore, not in violation of Kienitz's copyright. Because fair use is affirmative defense to a claim of copyright infringement, it is defendants' burden to prove it. *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).

The Copyright Act of 1976, 17 U.S.C. § 107, sets forth four, non-exclusive factors that a court must consider in determining whether a particular use of a copyrighted work is a fair use. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692 (7th Cir. 2012). Section 107 provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

I will address each factor separately:

**(1) Purpose and Character of Use**

The first factor is the "heart of the fair use inquiry" and requires consideration of how the copied work was used. *Cariou v. Prince*, 714 F.3d 694, 705 (2nd Cir. 2013) (citing *Blanch v.*

9

*Koons*, 467 F.3d 244, 251 (2nd Cir. 2006)). Although the copyright act instructs courts to look at the commercial nature of the use, the Supreme Court has made clear that commercial uses are not presumptively unfair. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 584 (1994) (finding Congress "could not have intended" such a blanket rule). "[N]early all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research . . . are generally conducted for profit." *Id.*

As the Court has explained, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562; s*ee also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2nd Cir. 1994) ("The commercial/ nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work."). As a result, the crucial inquiry in the first factor is "whether the new work merely supersedes the original work, or instead adds something new with a further purpose or of a different character." *Brownmark*, 682 F.3d at 693 (citing *Campbell*, 510 U.S. at 579, which defines a transformative work as one that "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message"). The Court observed that, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.

There is no question that defendants' SFP shirts were at least in part a commercial venture (albeit a paltry one, with 161 shirts sold over seven weeks). However, in addition to

10

trying to make a quick buck, defendants were poking fun at the mayor by spotlighting what they viewed as a curmudgeonly flip-flop on the block party. The fact that Kienitz or perhaps Mayor Soglin may have been offended by this soft jab does not mean that the shirts cannot be deemed a fair use. *Cf. Campbell*, 510 U.S. at 579-80 ("When Sonny Sniffs Glue" a fair use of "When Sunny Gets Blue"; "I Love Sodom" a fair use of "I Love New York").

Further, defendants did not use an exact replica of Kienitz's photograph for monetary gain. They made a monochromatic outline of Mayor Soglin's image in a Paschke-esque neon green, similar in appearance to a photographic negative. As a result, the character and expression of the image is completely different from the original. *See Cariou*, 714 F.3d at 706-07 (paintings incorporating copyrighted photographs of Rastafarians and the Jamaican landscape were transformative because paintings had different character, manifested entirely different aesthetic and gave photographs new expression: plaintiff's photographs were serene and deliberately composed, while defendant's art works were crude, jarring, hectic and provocative).

In the instant case, Kienitz's photograph, a candid shot from the inauguration, portrays Mayor Soglin with the gravitas and rectitude one would expect in the official portrait of a sitting mayor. Defendants employed this photograph for the diametric purposes of sophomoric humor and political critique. They had no intention of supplanting Kienitz's commercially valuable right; instead, defendants used Kienitz's photograph as raw material to create something entirely new with a different aesthetic, message and meaning. *See Campbell*, 510 U.S. at 579; *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 796, 803 (9th Cir. 2003) (photographs of one or more nude Barbie dolls juxtaposed in dangerous positions against vintage kitchen appliances were transformative); *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 142 (2nd

11

Cir. 1998) (citing Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)); *Blanch*, 467 F.3d at 252-53 (artist who used fashion photograph in collage painting did not repackage photograph but instead employed it "as fodder for his commentary on the social and aesthetic consequences of mass media").

Kienitz argues that the shirt is really a derivative work and that the concept of transformative use is most apt in cases where the defendant is making a commentary on the very work that is copied, such as with parody. Kienitz also contends that defendants' use of his photograph cannot be considered parody because the SFP shirts fail to comment on the photograph itself. This contention is debatable. Although the SFP shirts were not intended to parody Kienitz's photograph *ipsa*, the garishness of Soglin's re-colored visage could be viewed as mocking the gravitas and rectitude with which Kienitz's now-official portrait imbues the mayor. In any event, "a work may contain both parodic and nonparodic elements" and "[a] parody that more loosely targets an original . . . may still be sufficiently aimed at an original work to come within our analysis of parody." *Campbell,* 510 U.S. at 580, 581 n.14; *see also Rogers v. Koons*, 960 F.2d 301, 310 (2nd Cir. 1992) ("the copied work must be, at least in part, an object of the parody, otherwise there would be no need to conjure up the original work").

Kienitz is correct that courts have been more willing to grant fair use protections to parodies (using a work in order to poke fun at or comment on the work itself) than to satires (using a work to poke fun at or comment on something else). *See Campbell*, 510 U.S. at 580-81 ("Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing."). However,

> The law imposes no requirement that a work comment on the original or its author in order to be considered transformative, and a secondary work may constitute a fair use even if it serves some purpose other than those (criticism, comment, news reporting, teaching, scholarship, and research) identified in the preamble to the statute. Instead, . . . to qualify as a fair use, a new work generally must alter the original with new expression, meaning or message. [The] original must be employed in the creation of new information, new aesthetics, new insights and understandings.
>
> *Cariou*, 714 F.3d at 706 (citing *Campbell*, 510 U.S. at 577 and *Harper & Row*, 471 U.S. at 561).

A "work could be transformative even without commenting on [the author's] work or on culture"—"[w]hat is critical is how the work in question appears to the reasonable observer." *Id.* at 707. The Court in *Campbell* explained that

> when there is little or no risk of market substitution, whether because of the large extent of transformation of the original work, the new work's minimal distribution in the market, the small extent to which it borrows from the original, or other factors, taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use, as may satire with lesser justification for the borrowing than would otherwise be required.
>
> *Campbell,* 510 U.S. at 581 n.14.

Thus, parody is only one type of fair use, and the ultimate outcome turns on the application of the four fair use factors. *Id.* at 581 ("parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law").

These considerations reference the essence of the four fair use factors. As discussed in conjunction with the fourth factor, the SFP shirts "have no demonstrative capacity to divert sales from the original" photograph. *MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.*, 2004 WL 434404, *13 (S.D.N.Y. Mar. 8, 2004). As a result, "a showing of 'the parody's critical

relationship to the original' is less vital in the fair use analysis." *Id.* (quoting *Campbell*, 510 U.S. at 580 n.14). In this case, the robust transformative nature of defendants' SFP shirts tips this first factor toward fair use, even taking into account the fact that the shirts were a commercial product.

**(2) Nature of The Copyrighted Work**

Courts generally consider two aspects of a copyrighted work in evaluating this factor: (1) whether the work is more creative or factual in nature, and (2) whether it is unpublished, in which case the right of first publication is implicated. *Núñez v. Caribbean Intern. News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (citing *Harper & Row*, 471 U.S. at 563-64). "[T]he more creative the work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][2][a], p. 13-186 (Matthew Bender, 2013 Ed.). "Notwithstanding that general pronouncement, this second [fair use] factor more typically recedes into insignificance in the greater fair use calculus." *Id.*; *see also Campbell*, 510 U.S. at 586 (creative nature of the original work normally will not help much in determining whether a parody of the original is a fair use).

Photography is an art that often involves a fair amount of skill to do well, and merits copyright protection. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012); *Núñez*, 235 F.3d at 23. Kienitz argues that the Soglin photograph had several creative elements, including capturing Soglin's pose and expression and choosing the appropriate lens, angle and level of light. He compares the creative value of his photograph to those in *Burrow-Giles*

*Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884) (photograph of Oscar Wilde was original creative work because photographer posed the subject and selected his clothing, background, lighting and expression); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 115 (2nd Cir. 1998) (photograph of pregnant, nude Demi Moore that court found exhibited significant expression); *Rogers*, 960 F.2d at 303, 310 (photograph of husband and wife holding a litter of puppies held to have "more in common with fiction than with works based on facts" because artist selected light, location and arrangement of subjects); *Cariou v. Prince*, 784 F. Supp. 2d 337, 343, 352 (S.D.N.Y. 2011), *rev'd on other grounds*, 714 F.3d 694 (portraits of Rastafarians and Jamaican landscape photos "highly original and creative artistic works").[5]

However, as defendants point out, unlike many of the works cited by Kienitz, the photograph of Soglin was not an "artistic representation[] designed primarily to express [Kienitz's] ideas, emotions, or feelings," but is instead a candid image taken of the mayor at a political event. *Núñez*, 235 F.3d at 23 (revealing photos taken for modeling portfolio were a publicity attempt to highlight the subject's abilities as a potential model). In defendants' view, the Soglin photograph is primarily factual in nature, depicting what the mayor looked like at his inauguration. *See Fitzgerald v. CBS Broadcasting, Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007) (photograph of mobster transferred from jail "exercised no more than the minimum authorial decision-making necessary to make a work copyrightable"). Although defendants are correct that Kienitz's shot of Soglin might not contain or display as much artistic expression as the

---

[5] On appeal, the Court of Appeals for the Second Circuit noted that although "Cariou's work is creative and published," "this factor 'may be of limited usefulness where,' as here, 'the creative work of art is being used for a transformative purpose.'" *Cariou*, 714 F.3d at 710 (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2nd Cir. 2006)).

photographs in the cases cited by Kienitz, I cannot find that his photograph of Mayor Soglin was purely factual in nature like the photograph snapped in *Fitzgerald*. Kienitz would have made at least some artistic/creative decisions with respect to composition, lighting and timing. Also, as noted above, Kienitz succeeded in capturing an image of Soglin that portrays him as any decorous and distinguished mayor would like to be portrayed in his official website photograph. That's not necessarily easy to do.

With respect to the second aspect of the second factor, defendants' use of Kienitz's photograph did not usurp his right of first publication. Although the photograph never had been published in any book or public portfolio, it appears on the City of Madison website, on Mayor Soglin's internet blog and on his Facebook page. Kienitz intended for Mayor Soglin to use the photograph publically as an official portrait and for any other non-commercial use. *Núñez*, 235 F.3d at 24 (noting pictures commissioned for very purpose of semi-public dissemination).

With relevant considerations pointing both directions, I do not find that the factor addressing the nature of the work strongly favors either side. Therefore, I have attributed it little weight in the fair use analysis.

**(3) Amount and Substantiality of Work Used**

The third factor requires a court to examine the amount and substantiality of what was used in relation to the copyrighted work as a whole. *Harper & Row*, 471 U.S. at 564. It is both a qualitative and quantitative analysis. *Campbell*, 510 U.S. at 586; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2nd Cir. 2006). There is no per se rule against copying a work as a whole if it is necessary to the purpose and character of the use. *Chicago Bd. of Educ.*,

16

354 F.3d at 629. The focus is not on how much of the work was taken but to what extent the protected elements were copied from the original. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2nd Cir. 1987); 1 *Art, Artifact, Architecture and Museum Law* § 7.109.

Here, defendants did not take the "heart" of Kienitz's work, using a negative image and outline of the photograph and figuratively reversing the tenor of the image. *Cf. Harper & Row*, 471 U.S. at 565 (portions of book copied were most moving and interesting parts and qualitatively embodied author's distinctive expression). As a result, the artistic elements claimed by Kienitz (e.g., the lighting, expression and pose) fade to insignificance on the SFP shirts, if they do not evanesce completely. *See Bill Graham Archives*, 448 F.3d at 613 (although thumbnail images of concert posters used entire copyrighted images, "the visual impact of their artistic expression is significantly limited because of their reduced size"). Even in a side-by-side comparison, it is difficult to discern that the image on the SFP shirts is an altered version of the Soglin portrait created by Kienitz.

In sum, this factor weighs in favor of fair use because the amount and substantiality of the photograph used by defendants was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 587-88; *see also Blanch*, 467 F.3d at 258 (finding reasonable defendant's choice to extract portions of copyrighted work with purpose of evoking "certain style of mass communication").

**(4) Effect of Defendants' Use on the Market**

The Supreme Court has stated that this factor is "the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. "Fair use, when properly applied, is limited to

copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566-67, quoting 1 Nimmer, § 1.10[D] at 1-87; *see also Stewart v. Abend*, 495 U.S. 207, 238 (1990). The question is whether the new work will be a market substitute for the copyrighted material. *Campbell*, 510 U.S. at 591. A court must consider "not only the extent of the market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market'" for the original. *Id.* at 590 (quoting 3 Nimmer § 13.05[A][4], at 13–102.61). "The less adverse impact on the owner, the less public benefit need be shown to sustain non-commercial fair use." *Rogers*, 960 F.2d at 311-12.

In *Ty, Inc. v. Publications International Ltd.*, 292 F.3d 512, 518 (7th Cir. 2002), the court explained the essence of this factor by illustrating the distinction between transformative and superseding copies (or to use the dichotomy preferred by the court, "complementary" versus "substitutional" copying). If the new work substitutes for and is likely to reduce the demand for the copyrighted original, then it is not a fair use. *Id.* (explaining that a book review or parody compliments and does not reduce demand for original work, whereas burlesque is merely a humorous substitute catering to humor-loving segment of the original's market).

Viewing the two images side-by-side is enough to establish that defendants' SFP shirts were not a substitute for and did not reduce the demand for Kienitz's photographic portrait of Mayor Soglin. Anyone seeking a photographic portrait—or even just an accurate representative image—of the mayor would not even consider the garish image of the mayor splashed onto defendants' SFP shirts. That would be enough to quash the sale, but there's also the mocking apology garlanding the cartoonish image which partially blocks the mayor's features and which

18

would totally irritate viewers who deemed Mayor Soglin to be worthy of and deserving more respect. As the Court noted in *Campbell*, with a true transformation "it is more likely that the new work will not affect the market for the original . . . because the parody and the original usually serve different market functions." 510 U.S. at 591.

Even Kienitz recognizes that the market for his photograph and the market for defendants' SFP shirts are skew, as in nonintersecting and not even parallel. Kienitz avers that he would never license his photograph of Mayor Soglin for the purpose of criticizing, mocking, parodying or satirizing Mayor Soglin; indeed, he would never sanction such disrespect toward any of his photographic subjects. In what may be a frustrating paradox to a copyright holder, the farther from his original purpose, character and audience a subsequent use deviates, the more likely this use will be deemed fair because it is anything but a substitute for the copyrighted creation. So it is here. In sum, the facts relevant to this factor militate toward a finding of fair use by defendants.

### III. Conclusion

Factors (1), (3) and (4) of the fair use test favor defendants and factor (2) is pretty much a toss-up. As a result, I conclude that defendants have met their burden of establishing fair use. They are entitled to summary judgment on Kienitz's copyright claim. Given this finding, it is unnecessary to reach defendants' argument that the First Amendment considerations of free political speech and discourse also weigh in favor of fair use.[6]

---

[6] Defendants cite the Supreme Court's pronouncement that "copyright law contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186, 219, 221 (2003). In response, Kienitz points out that notwithstanding *Eldred*, the Seventh Circuit has found that the First Amendment does not otherwise add to or substitute for the fair use defense itself. *Chicago Bd. of Educ.*, 354 F.3d at 631.

ORDER

IT IS ORDERED that:

(1) The motion for summary judgment filed by defendants Sconnie Nation LLC and Underground Printing-Wisconsin, LLC (dkt. 13) is GRANTED.

(2) The motion for summary judgment filed by plaintiff Michael Kienitz (dkt. 16) is DENIED.

(3) The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 14th day of August, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge